*Turner.* Therefore, the administrator's decision violated appellant's constitutional right to marry.

Accordingly, the administrator's decision is reversed, and the matter is remanded to the Department to make appropriate arrangements for appellant and Mays to be married.

791 A.2d 285

STATE OF NEW JERSEY, IN THE INTEREST OF S.G.

Superior Court of New Jersey
Appellate Division

Submitted January 24, 2002—Decided February 14, 2002.

Newman, J.A.D., filed a dissenting opinion.

80

Before Judges NEWMAN, FALL and AXELRAD.

*Lee A. Solomon,* Prosecuter of Camden County, attorney for appellant, State of New Jersey, (*Diane Marano,* Assistant Prosecuter of counsel; *Nevan Soumilas,* Assistant Prosecuter on the brief).

*Sufrin, Zucker, Steinberg, Walker & Wixted,* attorneys for respondent, S.G., (*Saul J. Steinberg,* of counsel and on the brief).

PER CURIAM.

The State of New Jersey (State), appeals on leave granted by the Supreme Court from an order of the Chancery Division–Family Part, Camden County denying its motion to disqualify the law firm of Sufrin, Zucker, Steinberg, Waller & Wixted and its individual attorneys, Saul Steinberg (Steinberg) and Dennis Wixted (Wixted) (collectively "Sufrin firm"), from representing the juvenile, S.G., in the State's murder prosecution.

The State contends that in a criminal prosecution for murder in which the juvenile has privately retained counsel, a conflict of interest under the Rules of Professional Conduct (*R.P.C.*) 1.9(a)(2) or an appearance of impropriety under *R.P.C.* 1.7(c)(2) exists requiring the disqualification of defense counsel where that counsel also represented the murder victim on unrelated criminal charges. We are satisfied the trial judge properly rejected the motion to disqualify where neither of the Rules of Professional Conduct cited were violated. We further conclude the juvenile's Sixth Amendment right to counsel of his choice trumps any nebulous charge of an appearance of impropriety.

## I.

The facts are straightforward. Camden County juvenile delinquency complaint number FJ–04–885–02 charged S.G. with purposely or knowingly causing death or serious bodily injury resulting in death by the shooting of Theodore J. Hilton (the victim), in violation of *N.J.S.A.* 2C:11–3a(1)(2) (murder).

The shooting occurred on August 1, 2001, at Morton Street and Mt. Ephraim Avenue in Camden. According to the testimony of John Grier, an investigator in the homicide unit of the Camden County Prosecutor's Office, a group of people were standing around the corner of Morton Street and Mt. Ephraim Avenue for approximately two hours when a verbal confrontation erupted between a male identified as Woo and a female identified as Shirley. Incensed, Shirley left and returned twenty minutes later with five males, one of whom is alleged to be S.G. The five males descended upon the group and demanded that Woo apologize to Shirley. Woo apologized and the five males retreated. Approximately thirty minutes later, the person alleged to be S.G. returned with a firearm. He shot several times into the group still standing on the corner. The victim suffered a gun shot wound to the neck. The Camden Police reported the incident as an aggravated assault. The police report did not identify the shooter, but described him as five feet five inches and wearing dark clothes. The victim died seven days later in the hospital. On August 8, 2001, the Camden County Prosecutor's office superseded the investigation. The Prosecutor's office conducted an investigation into the shooting and arrested S.G.

On August 13, 2001, the State filed a motion, pursuant to *N.J.S.A.* 2A:4A–26, for involuntary transfer of the matter to the Law Division for prosecution of S.G. as an adult. The Chancery Division granted that motion on October 23, 2001.

In the interim, on August 14, 2001, Steinberg entered an appearance on behalf of S.G. Concomitantly, the State filed a motion to disqualify the Sufrin firm as defense counsel, alleging that the firm had a conflict of interest in the defense of this case because that firm previously represented the victim in a criminal case, and the firm was currently representing the victim in another criminal case. Apparently, the victim was indicted in 1996

and 2001 on unrelated criminal charges prior to his murder. On September 13, 1996, Steinberg entered an appearance on behalf of the victim. Presumably, the 1996 charges were resolved before August 1, 2001. On May 18, 2001, Wixted entered an appearance on behalf of the victim. The 2001 charges against the victim were pending at the time of the victim's murder. The Camden County Prosecutor's Office was involved in the prosecution of both cases.

On August 16, 2001, the court conducted a hearing and denied the State's motion to disqualify the Sufrin firm. In doing so, the judge had this to say:

I certainly understand the State's position, I understand the defense's position and any time we apply that standard of the appearance of impropriety, I start scratching my head because there are some extremely unclear lines as to what it means to be an appearance of impropriety. I perceive that the ... defendant/juvenile deals with a very fundamental United States Constitution Sixth Amendment Right, and I understand that that right includes the attorney of his or her choosing. I assume that since defense counsel has entered their appearance that in fact, this is the attorney of [S.G.'s] choosing. As such, and the fact that the representation clearly is over, the victim, defense counsel's former client is now obviously deceased, I don't perceive any specific direct conflict. I see ... the appearance issue which again is a vague term. There's very little help in this matter. There seems to be this *Needham*[1], and the *Bonnie Richards*[2] case. As such the Court will simply deny the application at this time and it could be raised at a later point depending on a number of factors, but at this juncture I don't see, conceive that the appearance of impropriety outweighs the fundamental Sixth Amendment right to have an attorney of one's choosing.

The court then proceeded with a probable cause hearing for detention purposes. The State continued to object to the Sufrin firm's representation of S.G.

After the disqualification hearing, the court held a waiver hearing at which time the juvenile and his family waived the potential conflict. The parties have not provided this court with a transcript of that hearing.

On August 20, 2001, the judge entered a written order specifically denying the State's motion to disqualify and denied the

---

[1] *State v. Needham*, 298 *N.J.Super.* 100, 688 *A.2d* 1135 (Law Div.1996).

[2] *State v. Richards*, No. A-1687-98T3, slip op. (App.Div. May 20, 1999).

State's request for a stay of the proceedings pending an interlocutory appeal. On September 5, 2001, the State filed a motion for leave to file an emergent interlocutory appeal, which this court denied on September 27, 2001. On October 15, 2001, the State filed a motion for leave to appeal with the Supreme Court.

On November 14, 2001, the Supreme Court granted leave to the State to appeal and summarily remanded the matter to this court for consideration of the appeal on the merits. The Supreme Court stayed all further proceedings in the trial court pending resolution of the disqualification issue.

## II.

On appeal, the State argues that the Sufrin firm's representation of S.G., when that firm previously represented the murder victim, constitutes a conflict of interest in violation of *R.P.C.* 1.9(a)(2) (former client) and 1.7(c)(2)(appearance of impropriety). The State maintains that the Sufrin firm's continued representation of S.G. will "place a cloud of doubt on any future proceedings," and will raise questions as to S.G.'s right to effective assistance of trial counsel.

The pertinent provisions of the Rules of Professional Conduct in terms of a lawyer's duty to maintain the confidences of a former client and to avoid conflicts of interest are *R.P.C.* 1.9(a)(2) and *R.P.C.* 1.7(c)(2).

Rule 1.9 provides:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

[*R.P.C.* 1.9]

Rule 1.7 provides the general rule that a lawyer shall not represent a client, without full disclosure to and consultation with

the client, if the lawyer believes that representation of that client will be directly adverse to another client, or if the representation of that client may be materially limited by other responsibilities or interests of the lawyer. *R.P.C.* 1.7(a) and (b). Subsection (c) contains the "appearance of impropriety" language, which reads:

> (c) This rule shall not alter the effect of case law or ethics opinions to the effect that:
>
> (1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and
>
> (2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.
>
> *[R.P.C.* 1.7(c)]

According to the State, the concern is that the Sufrin firm's attorney-client relationship with the victim gave rise to a continuing obligation of confidentiality and that (1) if the confidences are not kept, the Sufrin firm will use that information to benefit S.G.; or (2) if the confidences are kept, the representation of S.G. might prove to be ineffective due to the inability of the Sufrin firm to conduct a thorough cross examination, or that the public may perceive that S.G. gained advantages through the Sufrin firm's representation.

In *State v. Needham,* 298 *N.J.Super.* 100, 688 *A.*2d 1135 (Law Div.1996), the trial court confronted the issue of whether defense counsel must be disqualified upon motion by the State when that counsel represented one of the State's chief witnesses in an entirely unrelated matter. *Id.* at 102, 688 *A.*2d 1135. There, the State charged the defendant with various criminal offenses related to the defendant's armed stand-off with the police. *Ibid.* One such charge alleged that the defendant threatened one of the responding officers and his family. *Ibid.* The State expected that officer to testify at the defendant's trial. *Ibid.* The defendant's privately retained counsel previously represented the officer in an indictable criminal matter and in an internal affairs investigation. *Id.* at 103, 688 *A.*2d 1135. While the criminal matter was resolved prior to

the alleged incident, the internal affairs matter occurred at the same time that the charges against the defendant arose. *Ibid.*

There, the State moved to disqualify defense counsel on the basis of an appearance of impropriety. The court disqualified defense counsel, because it concluded that an adequate factual basis existed that created an appearance of impropriety. *Id.* at 107, 688 *A.*2d 1135. In doing so, the court noted that our Supreme Court requires courts to view the conduct from the perspective of the public to determine whether an appearance of impropriety exists. *Id.* at 104, 688 *A.*2d 1135. From this viewpoint the court found that defense counsel's prior representation of the officer would create an appearance of impropriety because the public could conclude that the officer could have unfairly aided the defendant directly or indirectly through defense counsel; or that defense counsel would not vigorously cross examine the officer because of their relationship. *Id.* at 104, 688 *A.*2d 1135.

In regard to the officer's aiding the defendant, the court acknowledged the continuing relationship between defense counsel and the officer. The existence of that relationship may cause concern with the public, the court reasoned, if the public thought the officer was not testifying fully because he wanted to remain in the good graces of defense counsel. The court noted that the public may question the results of the trial because of the influential relationship between defense counsel and the officer. The court also pointed out that negative public perception influenced the New Jersey Advisory Committee on Professional Ethics to issue advisory opinions forbidding such overlapping representation. *Id.* at 105, 688 *A.*2d 1135 (citing *Opinion 404,* 102 *N.J.L.J.* 205 (1978) (appearance of impropriety prohibits an attorney from representing a defendant where the chief prosecution witness is a police officer and former client of the same attorney); *Opinion 196,* 94 *N.J.L.J.* 65 (1971) (conflict of interest prohibits an attorney from representing an organization composed of law enforcement officers while simultaneously representing persons accused of crime, even where the defendants are not involved in law enforce-

ment); *Opinion 113,* 90 *N.J.L.J.* 473 (1967) (appearance of impropriety forbids an attorney from representing the Patrolmen's Benevolent Association in a municipality while also representing lay defendants in matters before the municipal court of that municipality)).

The court found that the public would perceive that defense counsel would not vigorously cross examine his former client. *Needham, supra,* 298 *N.J.Super.* at 106, 688 *A.*2d 1135. In this regard, the court observed that a failure of defense counsel to raise an issue, later revealed, may lead the public to conclude that the failure stemmed from defense counsel's relationship with the witness. *Id.* at 106, 688 *A.*2d 1135. Significant to the court's decision was its concern that defense counsel would use confidential information gained from the prior attorney-client relationship to cross examine his former client in violation of *R.P.C.* 1.9(a)(2).

Respecting this concern, the court recognized that defense counsel may be privy to information because of the prior representation. While defense counsel could not use information concerning the prior representation during cross examination, the court noted, defense counsel may exhibit influence over the officer through other information gained from the representation. *Id.* at 106, 688 *A.*2d 1135. The court went on to describe a number of confidences that defense counsel may have learned that he could use to discredit the officer. *Id.* at 106–107, 688 *A.*2d 1135.

Consequently, the court found that the possibilities of impropriety were strong, and the risks that the defendant would not be adequately represented were real. The court therefore disqualified defense counsel from representing the defendant on the specific offenses charged. *Id.* at 107, 688 *A.*2d 1135.

This case stands in stark contrast to *Needham.* The possibilities and risks here, at best, are weak and hypothetical. The obvious concern of a conflict, as pointed out in *Needham,* focuses on the former client's *participation* in the trial where defense counsel may engage in cross examination of that client. Clearly,

that prime concern is absent where the deceased client will not be a witness.

Regardless, the State contends that Steinberg may use confidential information to decide "whether to place [the victim's] conduct and character at issue, or simply investigate ways to do so at trial." However, the rules of evidence limit the ways in which the character of a victim may be introduced at trial. *See N.J.R.E.* 404(a)(2). In order to be introduced, evidence of a victim's character must be relevant to the substantive issue of guilt. *State v. Moore*, 122 *N.J.* 420, 464–466, 585 *A.*2d 864 (1991). Here, the character of the victim is irrelevant.

■ The facts, as presently known, disclose that the murder occurred when a male, alleged to be S.G., shot a firearm several times into a group of people standing on a street corner. The State has not alleged facts that would lead one to believe that the victim was the intended target of the bullet. Instead, it appears that someone shot into the group and a bullet aimlessly struck the victim. The victim was simply in the wrong place at the wrong time. As such, the victim's character is not relevant to the crime.

■ The State further argues that the Sufrin firm's representation of the victim creates an actual conflict of interest under *R.P.C.* 1.9(a)(2) because Steinberg and Wixted received confidential information from the victim, which confidence they may betray to advance S.G.'s interest. In a criminal trial, because a victim does not have standing to intervene, it is the State's interests that are directly at issue. Accordingly, the Sufrin firm's representation of S.G. is not directly adverse to the victim's interests. Therefore, an actual conflict does not exist.

■ The State maintains it "may choose to call" a family member or friend of the victim to vouch for his character or to testify as to the events leading up to the day of his murder. In this regard, the State argues that an appearance of impropriety under *R.P.C.* 1.7(c)(2) exists because Steinberg will be less likely to engage in an objective and vigorous cross examination of any

such witness, or because he may use the confidences gained during the representation of the victim to S.G.'s advantage. Thus, the State contends that the public will perceive that S.G. unfairly benefited from the Sufrin firm's prior representation. This mere possibility lacks a reasonable basis and is insufficient to constitute an appearance of impropriety. *State v. Loyal,* 164 *N.J.* 418, 429, 753 *A.*2d 1073 (2000).

Any evidence, testimonial or otherwise, of a victim's character must be relevant in order to be admissible. Here there is no showing of relevance. The facts, as presently alleged, indicate that someone shot randomly into a group, and that the shooter did not seek out the victim. As such, the State's proposed family/friend character testimony is not relevant. For the same reason, the proposed testimony concerning the "events leading up to" the day of the victim's death is irrelevant.

Even if the family/friend testimony was relevant and cross examination was necessary, the influential relationship between defense counsel and the State's witness that served as the factual predicate for the disqualification order in *Needham, supra,* is absent here. In *Needham* the court concerned itself with defense counsel's potential use of information to discredit his former client, and with the possibility that the former client would ingratiate himself to his former attorney. Those concerns do not exist on the facts of this case.

This court has previously considered the necessity for cross examination in reversing orders to disqualify defense counsel in *State v. Richards,* No. A–1687–98T3, slip op. (App.Div. May 20, 1999) and *State v. Muniz,* 260 *N.J.Super.* 309, 616 *A.*2d 926 (App.Div.1992). While we ordinarily would not discuss an unpublished opinion such as *Richards,* we do so here because the same parties are involved in the disqualification process.

In *Richards,* the defendant appealed an order to the trial court disqualifying her defense counsel because of the appearance of impropriety that resulted from defense counsel's firm having previously represented a witness for the state. *Richards, supra,*

at 1. There, the defendant was charged with official misconduct. The complaint underlying that charge was that the defendant, the welfare director of Haddon Township, required a welfare recipient to clean the defendant's home as part of the recipient's community service obligation, which was a prerequisite to receiving welfare benefits. The police department assigned a lieutenant to investigate the allegations. The lieutenant conducted interviews of the complainant, two employees, and the defendant. *Id.* at 2. Those statements were recorded on tape and transcribed. *Id.* at 3..

Thereafter, the defendant retained the Sufrin firm to represent her. That firm had previously represented the lieutenant in a bankruptcy action and real estate financing transaction. *Id.* at 2. On the day of trial, the State moved to disqualify defense counsel on the basis of that prior representation. *Ibid.* Similar to the within case, the State relied on *Needham, supra,* to support its disqualification motion. *Id.* at 3. The Sufrin firm argued that it was not necessary for the State to produce the lieutenant as a witness because defense counsel stipulated that the statements were accurately transcribed. *Ibid.* Thus, the Sufrin firm maintained that there was no reason to cross examine the lieutenant. However, the state refused to enter into a stipulation to eliminate the need to call the lieutenant as a witness. *Id.* at 4.

After considering the parties' arguments against the backdrop of the defendant's constitutional right to freely choose counsel and the need to maintain the high standards of the legal profession, this court reversed the disqualification order. *Id.* at 5–11. In doing so, this court noted that the Sufrin firm represented the lieutenant in matters unrelated to the defendant's case. *Id.* at 11. Further, this court explained that the Sufrin firm did not have an ongoing professional relationship with the lieutenant as its representation of him occurred several years before the defendant's case arose.

Significantly, this court acknowledged that the lieutenant's testimony would be limited to his investigatory findings, which were recorded and transcribed. Consequently, we concluded that the

Sufrin firm's prior representation of the lieutenant would not impact that documented evidence. *Id.* at 11. The documented evidence eliminated the need for cross examination and precluded any concerns, if the lieutenant did testify, that he would alter his testimony to "ingratiate" himself with defense counsel. As such this court reversed the disqualification order.

In *Muniz, supra,* the State sought disqualification of the Office of the Public Defender as counsel for defendant in a murder prosecution. *Id.* at 311, 616 *A.*2d 926. The trial court concluded that an "appearance of impropriety" existed because the same region of the public defender's office was representing the murder victim on an unrelated matter at the time of his death. *Ibid.* In reversing the disqualification order, this court distinguished between attorneys practicing law in the public and private sectors. *Id.* at 312, 616 *A.*2d 926. Relying on Supreme Court precedent, we acknowledged that attorneys in the public sector do not have a financial incentive to retain cases that involve multiple representations. *Ibid.* (citing *State v. Bell,* 90 *N.J.* 163, 447 *A.*2d 525 (1982)). Thus, because the financial benefits of private representation do not flow to the public defender's office, we reasoned, the public would not lose confidence in a rule allowing the public defender's office "to act in a way that would not be tolerated from private practice." *Id.* at 312–13, 616 *A.*2d 926. We went on to describe the specifics of the case as follows:

The Assistant Deputy Public Defender who represented the victim in his drug prosecution, which had been disposed of by negotiated plea and was pending sentencing at the time of his death, left the Public Defender's office before defendant's present counsel was hired; the file in that case was "sealed" by the Public Defender "and placed with a pool attorney" who later examined the file and had no objection to the representation of defendant by the regional Assistant Deputy Public Defender "since there is no possibility that an issue of privilege would arise requiring a waiver" of the victim's attorney client privilege; the victim and the defendant were not simultaneously represented by the Public Defender; the victim will not be able to testify; the State has no evidence that the murder prosecution has any relationship whatsoever to the former prosecution of the victim or that the victim's death has any relationship whatsoever to the victim's prosecution, and the defendant by certification has indicated that he wants his present attorney within the Office of the Public Defender "to proceed" with his representation.

[*Id.* at 315, 616 *A*.2d 926.]

So too here. This is a case of successive representation where the former client is deceased. The Sufrin firm did not simultaneously represent the juvenile and the victim. Steinberg represented the victim for the 1996 charge. At the time of the shooting, Wixted represented the victim for the 2001 charge. However, the victim died on August 8, 2001, at which time the charges became moot. The Sufrin firm's representation of the victim terminated on August 8, 2001. The Sufrin firm was no longer representing the victim on August 14, 2001, when Steinberg entered an appearance on behalf of S.G. Therefore, the financial incentive dicta in *Muniz* regarding private practice and multiple representation is not an issue.

■ The United States Supreme Court has recognized that defendants who retain their own lawyers are entitled to the same protections as the defendants for whom the state appoints counsel. *Cuyler v. Sullivan*, 446 *U.S.* 335, 344–345, 100 *S.Ct.* 1708, 1716, 64 *L. Ed.*2d 333, 344 (1980). As such there is no reason to draw a distinction between retained and appointed counsel that denies equal justice to defendants who have retained private counsel. *Ibid.* It borders on the unconstitutional to interpret *Muniz* to stand for the proposition that private attorneys, because of their pecuniary interests, cannot represent successive clients in criminal matters. To do so would deprive a defendant with retained counsel from the protections of the Sixth Amendment while affording that right to a defendant with appointed counsel. Instead, it is constitutionally principled to consider the *Muniz* case in its entirety, and conclude that where defense counsel has no relevant confidential information there is no conflict, and where defense counsel does have such information he or she cannot use it.

Similar to *Muniz,* there is no possibility that an issue of privilege would arise requiring a waiver of the victim's attorney-client privilege where the victim is deceased. The State, who prosecuted the victim's prior charges, has not furnished any evidence to indicate that its murder prosecution has any relation-

ship to the former prosecution of the victim or that the victim's death has any relationship to that prosecution. Out of extreme caution, S.G. has indicated, at a hearing, that he wants his present attorney to continue his representation and has waived any potential conflict.

### III.

The State next argues that the prior representation is an actual conflict because "[n]othing would be more disadvantageous to [the victim], the [Sufrin firm's] former client, than to have his killer go free." That statement impermissibly presumes S.G.'s guilt. *State v. Medina*, 147 *N.J.* 43, 57, 685 *A.*2d 1242 (1996) (defendants are presumed innocent until the state proves beyond a reasonable doubt otherwise), *cert. denied*, 520 *U.S.* 1190, 117 *S.Ct.* 1476, 137 *L. Ed.*2d 688 (1997). It also amounts to a contention that the Sufrin firm's previous representation of the murder victim, in and of itself, is an actual and apparent conflict that warrants disqualification. While we agree that it looks bad for privately retained counsel to represent the person alleged to have killed that counsel's former client, the Rules of Professional Conduct do not prohibit that representation.

All lawyers are bound to retain the confidences of their clients, *R.P.C.* 1.6, and their former clients, *R.P.C.* 1.9, and are obligated to refrain from engaging in representation that would appear inappropriate, *R.P.C.* 1.7(c)(2). They are also prohibited from engaging in conduct that is prejudicial to the administration of justice, *R.P.C.* 8.4(d), and are required to refrain or withdraw from the representation of a client if that representation will result in a violation of the Rules of Professional Conduct, *R.P.C.* 1.16(a)(1). There is, however, no rule that prohibits a lawyer from representing a client because of a subjective belief that the representation will look bad. Indeed, courts have recognized that even where representation "looks bad" in some indeterminate way, "the appearance of impropriety alone is 'simply too slender a reed on which to rest a disqualification order except in the rarest of

cases.' " *Olivier v. Town of Cumberland,* 540 *A.*2d 23 (R.I.1988) (citing *Sellers v. Superior Court,* 154 *Ariz.* 281, 742 *P.*2d 292, 300 (Ct.App.1987)).

The weight of federal authority, in the context of ineffective assistance claims based on defense counsel's former representation of the murder victim, refutes the State's contention. *See Mickens v. Greene,* 74 *F.Supp.*2d 586, 604 (E.D.Va.1999), *judgment aff'd, sub nom, Mickens v. Taylor,* 240 *F.*3d 348 (4th Cir.(Va.) 2001), *cert. granted in part,* 532 *U.S.* 970, 121 *S.Ct.* 1651, 149 *L. Ed.*2d 467 (2001) (citing *Crisp v. Duckworth,* 743 *F.*2d 580, 588 (7th Cir.1984) (finding no conflict where defense counsel previously represented murder victim in unrelated criminal action), *cert. denied,* 469 *U.S.* 1226, 105 *S.Ct.* 1221, 84 *L. Ed.*2d 361 (1985); *Kirkpatrick v. Butler,* 870 *F.*2d 276, 284 (5th Cir.1989) (finding no conflict where defense counsel had friendship with, and had in the past represented, members of murder victim's family), *cert. denied,* 493 *U.S.* 1051, 110 *S.Ct.* 854, 107 *L. Ed.*2d 848 (1990); *Moseley v. Scully,* 908 *F.Supp.* 1120 (E.D.N.Y.1995) (finding no actual conflict where counsel previously represented murder victim on unrelated charges), *aff'd,* 104 *F.*3d 356 (2nd Cir.(N.Y.) 1996); *Dixson v. Quarles,* 627 *F.Supp.* 50 (E.D.Mich.) (finding no actual conflict even though defense counsel previously represented the murder victim), *aff'd,* 781 *F.*2d 534, 535 (6th Cir.1985), *cert. denied,* 479 *U.S.* 935, 107 *S.Ct.* 411, 93 *L. Ed.*2d 362 (1986)).

Even where defense counsel had a personal relationship with the murder victim, courts have refused to find an actual conflict on that basis alone. *Catlett v. State,* 331 *Ark.* 270, 962 *S.W.*2d 313 (1998) (no actual conflict where defense counsel was high school classmate of victim's father, whom defense counsel had not seen for thirty years); *Ney v. State,* 227 *Ga.App.* 496, 489 *S.E.*2d 509, *reconsid. denied,* (1997), *cert. denied,* (1998)(no actual conflict where defense counsel was related by blood to victim where defense counsel conducted thorough cross examination of victim); *State v. Wood,* 132 *Idaho* 88, 967 *P.*2d 702 (1998)(no actual conflict in murder prosecution where two members of defense counsel's

law firm had personal association with victim's family), *cert. denied,* 526 *U.S.* 1118, 119 *S.Ct.* 1768, 143 *L. Ed.*2d 798 (1999); *Ex Parte Bell,* 511 *So.*2d 519 (Ala.App.1987)(no actual conflict where defendant in murder prosecution by attorneys who had personally known victim); *Aubrey v. State,* 478 *N.E.*2d 70 (Ind.1985)(no actual conflict where defense counsel was former husband of the victim's mother); *People v. Davis,* 97 *Ill.*2d 1, 72 *Ill.Dec.* 272, 452 *N.E.*2d 525 (1983) (no actual conflict where defense counsel had personal relationship with the murder victim); *People v. Lewis,* 88 *Ill.*2d 429, 58 *Ill.Dec.* 743, 430 *N.E.*2d 994 (1981) (no actual conflict where defense counsel had friendship with murder victim), *cert. denied,* 460 *U.S.* 1053, 103 *S.Ct.* 1501, 75 *L. Ed.*2d 932 (1983); *See also* Annotation, *Circumstances Giving Rise to Prejudicial Conflict of Interests Between Criminal Defendant and Defense Counsel—State Cases,* 18 *A.L.R.4th* 360, 504–510, 1982 *WL* 198959 (1982 and 2001 Supp.).

The case of *Mickens v. Greene, supra,* is particularly instructive and is presently pending in the Supreme Court of the United States on the grant of *certiorari* in part. In *Mickens,* the court appointed defense counsel to represent the defendant against the State's murder prosecution. *Mickens* 74 *F.Supp.*2d at 591. The State sought the death penalty. *Id.* at 590. A jury convicted the defendant and he was sentenced to death. *Ibid.* The defendant's trial attorney also represented the defendant on his direct appeal. *Id.* at 591. Thereafter, the defendant obtained successive counsel to pursue federal habeas corpus proceedings. *Id.* at 600.

While preparing for the appeal, the new counsel discovered a conflict between the defendant's trial counsel and the murder victim, which defense counsel did not disclose to the court or to the defendant. *Ibid.* Apparently, the court previously appointed defense counsel to represent the juvenile victim in an unrelated criminal matter. *Id.* at 612. The same judge that appointed defense counsel to the juvenile victim, also relieved that attorney after the victim's death and appointed, on the next day, that same attorney to represent the victim's alleged murderer. *Ibid.* Thus,

the judge knew or should have known of the potential conflict and should have conducted a hearing to address that conflict.

The defendant included this undisclosed conflict in his appeal to support his claim of ineffective assistance of counsel. The district court upheld the conviction notwithstanding the attorney's failure to disclose the conflict, and the court's failure to conduct a hearing. *Id.* at 614–15. The circuit court affirmed, *sub nom, Mickens v. Taylor,* 240 *F.*3d 348 (4th Cir.(Va.) 2001). The Supreme Court has granted certiorari in part, 532 *U.S.* 970, 121 *S.Ct.* 1651, 149 *L. Ed.*2d 467 (U.S.2001), to consider whether the trial court's failure to inquire into a potential conflict of interest about which it reasonably should have known establishes a Sixth Amendment violation where defendant has not shown an actual conflict of interest and an adverse effect of that conflict.

■ The decisions of the lower federal courts in *Mickens* and the certified question pending before the Supreme Court make it clear that defense counsel's representation of the defendant against a murder prosecution where that defense counsel has previously represented the murder victim is not an actual conflict per se. Instead, those circumstances present only the potential for a conflict that requires a hearing before the trial court. In this case, an actual conflict does not exist and the trial court conducted a hearing to consider the potential conflict and found disqualification is unwarranted.

■ The foregoing authority teaches that courts are to determine, on a case-by-case basis, whether defense counsel has divided interests that prevent the effective representation of a defendant. If the conflict could cause defense counsel to improperly use privileged communications during cross examination, then disqualification is appropriate. Disqualification is also appropriate if the conflict could deter defense counsel from conducting a vigorous cross examination. In this particular case, for the reasons discussed *supra,* disqualification is not appropriate, and, for the reasons discussed *infra,* in the absence of an actual conflict or

potentially serious conflict it would be unconstitutional to establish a presumption in favor of disqualification.

## IV.

■ Disqualification of a criminal defendant's chosen counsel is a harsh remedy that should be invoked infrequently because it raises problems of a constitutional dimension. *State v. Ehlers*, 262 *Neb.* 247, 631 *N.W.*2d 471, 479 (2001). The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to have the assistance of counsel for his or her defense. *Gideon v. Wainwright*, 372 *U.S.* 335, 339–341, 83 *S.Ct.* 792, 794–795, 9 *L. Ed.*2d 799, 802–803 (1963). A similar right to counsel is found in the New Jersey Constitution, *N.J. Const.* art. 1, ¶ 10; *State v. Sugar*, 84 *N.J.* 1, 15–17, 417 *A.*2d 474 (1980). The United States Supreme Court has recognized that an essential part of that right is the defendant's ability to select the counsel of his or her choice. *See Wheat v. United States*, 486 *U.S.* 153, 108 *S.Ct.* 1692, 100 *L. Ed.*2d 140 (1988); *Powell v. Alabama*, 287 *U.S.* 45, 53 *S.Ct.* 55, 77 *L.Ed.* 158 (1932).

■ Thus, the Sixth Amendment recognizes a presumption in favor of the defendant's chosen counsel, *Wheat, supra*, 486 *U.S.* at 164, 108 *S.Ct.* at 1700, 100 *L. Ed.*2d 140, and encompasses the right to assistance of counsel unhindered by a conflict of interest. *Cuyler, supra*, 446 *U.S.* 335, 100 *S.Ct.* 1708, 64 *L. Ed.*2d 333. A trial court must recognize a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome by a demonstration of actual conflict or a showing of a serious potential for conflict. *Wheat, supra*, 486 *U.S.* at 162–63, 108 *S.Ct.* at 1698–99, 100 *L. Ed.*2d at 150–151. Disqualification in such cases is necessary because when a defendant is represented by an attorney who has an actual or potentially serious conflict, the defendant may be deprived of effective assistance of counsel. *Id.*

■ A defendant can waive his or her right to assistance of counsel unhindered by a conflict of interest, provided that the

waiver is knowing and intelligent. *Muniz, supra,* 260 *N.J.Super.* at 315, 616 *A.*2d 926. However, a court is not required to accept a defendant's waiver in all circumstances. *Loyal, supra,* 164 *N.J.* at 430, 753 *A.*2d 1073. Therefore, the right to counsel of choice is not absolute. *Wheat, supra,* 486 *U.S.* at 159, 108 *S.Ct.* at 1697, 100 *L. Ed.*2d at 149. This is so because the Supreme Court has also recognized an independent interest of the courts in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. *Wheat, supra,* 486 *U.S.* at 160, 108 *S.Ct.* at 1698, 100 *L.Ed.*2d at 149. Therefore, when determining whether or not to disqualify defense counsel, courts must balance the defendant's Sixth Amendment right to counsel of choice against his right to representation free from conflicts.

As discussed *supra,* this is a case of successive representation that does not involve an actual conflict of interest. A potentially serious conflict is also not present. The Supreme Court has stated that the seriousness of any potential conflict depends on its "likelihood and dimensions." *Wheat, supra,* 486 *U.S.* at 162, 108 *S.Ct.* at 1699, 100 *L. Ed.*2d at 151. Here, the State did not present evidence to suggest that the Sufrin firm obtained any relevant confidential information from the victim. Even if it is assumed that the Sufrin firm was privy to confidential information, *Reardon v. Marlayne, Inc.,* 83 *N.J.* 460, 473, 416 *A.*2d 852 (1980), there is no evidence to conclude that the confidential information would be relevant to the charges in the present case.

While the record does not indicate what confidences were imparted to the Sufrin firm, it is not likely that the Sufrin firm's knowledge of any confidences will create an actual or potentially serious conflict affecting cross examination. As discussed *supra,* the victim is deceased and will not be participating as a witness. The rules of evidence adequately protect the State's concern over the proposed family/friend testimonial character evidence, and there is not even a remote possibility that those hypothetical witnesses may wish to "ingratiate" themselves with defense coun-

sel. Accordingly, there is no evidence that S.G.'s attorney is privy to confidential information that will compromise any ethical duty to the victim, or that will deprive S.G. of effective assistance of counsel.

In sum, the judicial system's interest in safeguarding the criminal proceedings is not threatened. When an actual or apparent conflict does not exist and where any potential conflict is improbable, the interests of the judicial system will not be undermined. *Ehlers, supra,* 631 *N.W.*2d at 484. To the contrary, in a case such as this where the potential conflict is a mere possibility, the disqualification of a juvenile's counsel of choice would compromise the judicial system by denying the juvenile his constitutional right to his attorney of choice. *Ibid.*

The order denying disqualification of the Sufrin firm is affirmed.

NEWMAN, J.A.D., dissenting.

I would grant the State's application to disqualify the Sufrin law firm from representing S.G. Simply stated, an attorney shall not represent an accused who is charged with murdering the attorney's client and to do so is in violation of *R.P.C.* 1.7.

*R.P.C.* 1.7 is the general rule involving conflict of interest and provides as follows:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and

(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is

undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

[*R.P.C.* 1.7(a) and (b) ].

*R.P.C.* 1.7 illustrates what is absent in this case, which renders the conflict of interest incurable; namely, that the deceased is in no position to consent to his attorney's representing the person accused of killing him, even if all of the circumstances were fully disclosed. Interestingly, *R.P.C.* 1.7 carves an exception to consent, depriving a public entity from the ability "to consent to any such representation" even after full disclosure, *R.P.C.* 1.7(a)(2) and (b)(2). If a public entity is precluded from entering into a consensual arrangement, I fail to see why a client who lacks the capacity to consent should be treated any differently.

With this background of *R.P.C.* 1.7 in mind, it is well to consider the remainder of the rule, which reads:

(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:

(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

[*R.P.C.* 1.7(c) ].

There are certain categories of cases involving apparent conflicts in which consent to representation is immaterial. In my view, this is one of those cases because consent cannot be forthcoming from a deceased client who lacks the capacity to consent. Usually, the client may be a witness in a proceeding involving the former attorney and a court could fully explore the circumstances and each of the client's could make a knowing, intelligent, and voluntary decision to consent. Where the client is a victim, it is unlikely that consent will be permitted because the attorney may have to cross-examine his own client. The result should be no different where the client is unable to consent by reason of death.

The appearance of impropriety rather than an actual conflict, viewed from the perspective of an ordinary knowledgeable citizen acquainted with the facts, would likewise result in disqualification. The fact that the present scenario appears to be a random shooting, described by the majority as the victim being "in the wrong place at the wrong time" makes no difference. No matter how the public is assured that the attorney may not trade on confidential information acquired through the attorney-client relationship, there is no way of knowing with any reasonable certainty that has not been done because the client's voice cannot be heard. Similarly, the attorney's effectiveness could be compromised by reason of the former attorney-client bond, and there is no meaningful way to measure whether this has occurred. The end result is a disservice to the administration of criminal justice. The public should not have to harbor any lingering doubts. The sure way to eliminate this from happening is to preclude an attorney from representing the accused charged with killing his client.

On a practical level, I do not understand why an attorney would place himself or herself in a position of representing an accused charged with murdering that attorney's client. If an acquittal is obtained, there will be suspicions that the attorney traded on confidential information from the decedent, which may have assisted the accused. If there is a conviction, doubts will persist that the attorney's effort may have been affected by the prior relationship with the decedent. In colloquial terms, it is a "no win" situation.

Overshadowing this entire discussion is the accused's constitutional right to counsel of his choice. As the majority has pointed out, that right is not absolute. Here, it would have to yield to the ethical requirements applicable to all lawyers. Had an opinion on this subject already been a fixture in the legal precedents, the attorney would have declined to represent S.G. That not being the case, it should be so now. The Sufrin law firm's representation of S.G. should be terminated. *R.P.C.* 1.16(a)(1).